*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EUGENE SEALS,

        Plaintiff-Appellant,

v

SAGINAW TOWNSHIP COMMUNITY
SCHOOLS, KENNETH KRAATZ, and CRAIG
AIMAR,

        Defendants-Appellees.

UNPUBLISHED
May 07, 2026
11:33 AM

No. 373684
Saginaw Circuit Court
LC No. 23-001503-CD

Before: RIORDAN, P.J., and REDFORD and PATEL, JJ.

PER CURIAM.

In this case of alleged race discrimination, plaintiff Eugene Seals appeals as of right the trial court's written opinion and order granting summary disposition in favor of defendants Saginaw Township Community Schools ("STCS"), Kenneth Kraatz, and Craig Aimar pursuant to MCR 2.116(C)(10). On appeal, plaintiff argues that the trial court erred by dismissing his race-discrimination claim under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, and his claim for tortious interference with a business relationship. We disagree and affirm.

## I. FACTS

In July 2023, plaintiff filed his complaint against defendants. Kraatz was the athletic director for STCS, Aimar was the athletic director for John Glenn High School, a high school in nearby Bay City, and plaintiff was the varsity girls' basketball coach for Heritage High School, a high school within STCS. On February 14, 2022, Kraatz submitted a report to the Michigan High School Athletic Association (MHSAA) clearly implying that plaintiff had improperly recruited a high-school basketball player, "Student A" (hereinafter R.G.), from John Glenn to Heritage and allowed her to participate in varsity basketball team activities at Heritage despite her athletic eligibility to do so being in doubt. The report also indicated that plaintiff concealed relevant facts during the investigation into the matter. According to plaintiff, such incriminating statements in the report, which were false, resulted in his termination as the varsity girls' basketball coach. Plaintiff alleged that the false statements had a racially discriminatory intent, as demonstrated by

-1-

the fact that he, an African-American man, was replaced by a Caucasian coach. Plaintiff thus maintained an ELCRA claim against all three defendants, as well as other claims such as tortious interference against Amair.

After several months of court proceedings, defendants moved for summary disposition pursuant to MCR 2.116(C)(10). The various documents filed by the parties in relation to that motion established the following underlying facts.

The MHSAA is an organization that provides rules and guidelines for its member schools with respect to athletics. STCS, as with most schools in the state, is a member of the MHSAA. Section 10 of the MHSAA Handbook for the 2021-2022 School Year provided, in relevant part:

SECTION 10 – UNDUE INFLUENCE

SECTION 10—The use of undue influence for athletic purposes by any person or persons directly or indirectly associated with a student, a student's parents, the school or its athletic program to secure or encourage the attendance of a student or the student's parents or guardians as residents of the school district, shall cause the student to become ineligible for interscholastic scrimmages or contests a minimum of 90 scheduled school days and a maximum of four years. The offending school shall be placed on probation for up to four years and offending individuals disconnected from the program. The offending coach or coaches shall not be permitted to coach at that school for up to four years in any sport and shall not coach for up to four years at any other member school in any MHSAA tournament in any sport. Examples of undue influence would include but not be limited to offers of or acceptance of: residential relocation, financial aid to parents, guardians or student; reduced or eliminated tuition and/or fees; any special privileges not accorded to other students, whether athletes or not; transportation allowances; preference in job assignments; room, board or clothing; promotional efforts and admission policies for athletes which are in excess of efforts for other students. [Emphasis omitted.]

Section 10 also included illustrations regarding "undue influence," such as the following:

105. When a student at a junior high/middle school or other high school, or the parents of that student, contacts the coach about attending the coach's school, the coach shall refer the student or parent to the appropriate school personnel (those who have the responsibilities for seeking and processing prospective students). It is not a coach's role to explain or encourage a transfer student in how to gain interscholastic athletic eligibility. There should be no contact or communication regarding enrollment between coaches and potential transfer students or incoming 9th-graders or their parents.

106. Except as permitted under Interpretations 101 and 102, a high school coach may not initiate contact with a student at a junior high/middle school or other high school, or the parents of that student, about attendance at the school. It is not a violation for a coach to have normal community contact with a student who

attends a junior high/middle school of the same system which is a feeder to the high school.

107. Normal community contact may include but is not limited to that which is unavoidable, brief, incidental to other intentions and without prior knowledge that it is likely to occur.

108. It is a violation of the undue influence regulation if coaches or their representatives call, send questionnaires, cards, electronic messages or letters or visit prospective athletes and their families at their homes.

\* \* \*

115. It is an undue influence violation for a person directly or indirectly associated with a school or for a person whose activities are related to athletics to arrange, secure or encourage the arrival or residency of a student into a school district or the enrollment of a student into a school based on athletic ability or potential. It is undue influence for a student of one school to encourage because of athletics the relocation to their community or transfer to their school by students who are enrolled in another school. [Emphasis omitted.]

In June 2020, plaintiff was hired by STCS to be the varsity girls' basketball coach at Heritage and other related administrative responsibilities within STCS. In addition to those coaching and administrative positions, plaintiff was involved with an Amateur Athletic Union ("AAU") travel basketball program in the region, a program that seeks to develop younger athletic talent.

On or about November 17, 2021, STCS received a transfer form from R.G. indicating, in relevant part, that she had moved to Saginaw a week ago and that she was seeking to transfer from John Glenn to Heritage. When asked to "List ALL high school sports the student participated in (game/meet or scrimmage at any level) in the most recent previous school year," the form stated, "Volleyball." And, when asked to identify the sports in which the student desired to participate at the new school, the form stated, "Soccer." Moreover, the form indicated that R.G. had never been coached while at the previous high school by a member of the STCS coaching staff.

The form was submitted to Aimar to approve and sign. However, on November 19, 2021, Aimar e-mailed Cody Inglis, the assistant director of the MHSAA, explaining that he had received a transfer form with questionable information. In particular, Aimar explained, "[t]he student [R.G.] . . . attended 3 days of tryouts for JGHS Varsity Girls Basketball on November 8, 9 and 10 and didn't make Varsity as a sophomore but was offered a spot on JV which she did accept. She then did not attend Thursday and Friday practice and I received this form that she is transferring schools." Aimar continued:

She did play Volleyball at JGHS in Fall of 21, and played JV Girls Basketball in Winter of 21 (last year) for JGHS. Upon learning this news about a potential transfer I ask[ed] around and word is she is moving schools because she didn't make Varsity and her mom "knows" a [STCS] coach. . . . I find it very fishy that this all happened within a week and it seems to be very athletically motivated. . . .

Inglis responded that Aimar should contact Kraatz to discuss the matter with him, as the primary burden was on STCS to ensure athletic eligibility. Aimar did so, which triggered an investigation.

On February 14, 2022, Kraatz submitted an investigative report to Inglis in his capacity as MHSAA assistant director. In the report, Kraatz explained that upon receiving a phone call from Aimar on or about November 22, 2021, he discussed the matter with plaintiff. The report states, in relevant part:[1]

> Do you know Student A, a move-in student from John Glenn?
>
> He knew of her, that his wife had let him know that a basketball player from John Glenn had moved into the district.
>
> I informed him that John Glenn told me that he was her AAU coach. So you have never coached her in the past?
>
> She was in the same organization, but he never coached her directly.
>
> So you have never coached her, messaged her, no phone calls, No D.M.'s anything that you can think of that I may want to get out in front of?
>
> I had very limited contact with her when she was younger, but has had no recent contact/communication with her.
>
> I finished the conversation by telling Coach Seals that because of the current situation Student A is ineligible and she is not to practice or play with the team. It would be best if she didn't associate with the team at all. Coach Seals disputes that I said this to him.

The report then explained the results of the investigation:

> It was found that even though Coach Seals initially stated that he knew of Student A but never coached her, it became obvious through social media that she was a member of several of his AAU teams and conducted various training sessions with her. . . . Student A's Mother said that Student A was on the roster and very active in Coach Seals AAU program in the 8th grade and he trained her in 9th grade. Social Media shows her being in at least 3 AAU tournaments coached by Coach Seals. Social Media also shows that he trained her up until at least February 27, 2021.
>
> When initially asked about contact with Student A or her mother, Coach Seals stated that there was no recent contact with either her or her mother. As the

---

[1] The indentations and format of the following block quote have been partially modified for ease of reading.

investigation had progressed we learned there were messages between Student A, her mother, and Coach Seals. Coach Seals stated that the messages were related to training times and road conditions for practice. Mother stated that there was a phone call about Student A not being able to participate with the team, she did not share any other details. . . .

Even though Coach Seals was told Student A was ineligible and should not be associated with the girls basketball team, it was later brought to our attention through an email from John Glenn that she was a participant in the pre-game, sitting on the bench, in the team huddle during timeouts and generally behaving as an active member of the team. The athletic department had no knowledge of her participation on the basketball team, there was no documentation, transportation permission slip or communication in any form that ever allowed Coach Seals to practice or transport Student A. . . .

When Coach Seals was asked why he let Student A practice with the varsity and not the JV, he responded that the JV coach is not a good enough coach to coach some of his better players. He stated that his JV coach is only good enough to coach the players that will never play varsity.

When asked about her being a member of his team, Coach Seals said that even though John Glenn is saying she was in a warm-up during the game she was never given a uniform or warm-up and her only role on the team is taking stats during games. After watching 2 complete game films Student A is clearly seen participating in pregame warm-up and lined-up with the team while the starting line-up was announced. She was not in any warm-up or uniform. When watching the Frankenmuth (away game Dec.3rd) film she is never seen actually taking any stats nor does she have an i-pad or paper in her hand. She could be considered a member of the team. . . . It was also later learned that she was in the team photo in full uniform, and the photo had to be retaken mid-way through the season to remove Student A from the team photo. . . .

In the Student A's Mother meeting she stated that her move to Heritage was not athletically motivated and she moved to Heritage High School because it is a great school and has a lot of diversity. She felt that John Glenn lacked diversity and had an issue with racism. . . .

About a month later, on March 10, 2022, Mark Uyl, the executive director of the MHSAA, issued the following response to Kraatz:

Based on the information provided in your letter, it is clear that a reasonable person would believe that a violation of *MHSAA Handbook*, Regulation I, Section 10, Undue Influence (Recruiting) has occurred. The *MHSAA Handbook* states the following regarding penalties:

The offending school shall be placed on probation for up to four years and offending individuals disconnected from the program.

The offending coach or coaches shall not be permitted to coach at that school for up to four years in any sport and shall not coach for up to four years at any other member school in any MHSAA tournament in any sport.

In this matter, the Heritage High School girls basketball program will be placed on probation for two years which will include the 2022-23 and 2023-24 school years. This same two-year penalty that prohibits coaching at any MHSAA member school, including Heritage High School, will be applied to Coach Seals for the 2022-23 and 2023-24 school years. We also understand that your school district may take additional action because of the dishonesty of Coach Seals regarding his previous coaching contact with this student and his actions of allowing this ineligible student to be fully engaged as an active team member without approval of your athletic department.

Given the undue influence violation, the student was ineligible for the 2021-22 season in basketball and will continue to be ineligible for the 2022-23 school year in basketball.

On April 3, 2022, plaintiff submitted his letter of resignation, stating that "[t]his decision, in no way, reflects any feeling of guilt or wrong doing on my part. It is one hundred percent related to the lack of integrity in your athletic office. . . . The athletic director's campaign to smear myself and anyone who was connected to me to get his friend in to my position is sickening. . . ."

Apparently, at about the same time, plaintiff discussed or sought to challenge the matter with the MHSAA. On July 18, 2022, Uyl responded to plaintiff on behalf of the MHSAA, stating, in relevant part:

In this matter, you were given a two-year penalty for the 2022-23 and 2023-24 school years. Based on the conversations that have taken place between yourself and MHSAA staff, the two-year individual penalty will be removed contingent upon your completion of the MHSAA Coaches Advancement Program Level 1 (repeat) and Level 2 (new) courses. From everything that has transpired, it is clear that additional education is appropriate should you wish to return to coaching at an MHSAA member school. Once Level 1 and Level 2 CAP courses are completed, we will provide an updated letter that can be shared with schools with prospective coaching opportunities.

When plaintiff was deposed in March 2024 for this case, he explained that he had completed the required courses mentioned above and that he would be coaching on behalf of the AAU.[2]

---

[2] According to defendants, plaintiff testified in his deposition that he currently was coaching MHSAA athletics. However, his testimony is brief and unclear with regard to MHSAA athletics, although it is clear with regard to the AAU.

In light of these facts, defendants argued that they were entitled to summary disposition of plaintiff's ELCRA claim under MCR 2.116(C)(10) because (1) the MHSAA, not defendants themselves, imposed an employment-related penalty against plaintiff; (2) plaintiff was not constructively discharged by defendants, as he voluntarily resigned; and (3) defendants had non-discriminatory reasons for their actions that plaintiff could not rebut. Defendants argued that plaintiff's remaining claims were meritless as well.

In his response, plaintiff highlighted several purported inconsistencies and inaccuracies in the record suggesting that the investigation was a pretext to terminate his employment because of his race. For example, the February 14, 2022 investigation report authored by Kraatz indicated that plaintiff falsely said that he did not "coach" R.G. However, plaintiff explained, "RG did testify [in her deposition] that she *trained with* Pride and Storm, basketball programs Plaintiff is involved in, but not that the Plaintiff *coached her* during high school through Plaintiff's AAU programs." (Emphasis in original.) Thus, according to plaintiff, the February 14, 2022 investigation report was inaccurate to that extent, i.e., the report falsely conflated coaching with training. As another example, Kraatz testified in his deposition that he sent the November 17, 2021 transfer form to Aimar, whereas an e-mail exchange subsequently uncovered by plaintiff during these proceedings showed that the STCS athletics secretary, not Kraatz, was the person who sent the transfer form to Aimar. As a third example of an alleged inaccuracy, when R.G. was asked during her deposition whether "the school primarily asked the white basketball players" about the alleged recruitment, R.G. responded, "Yes. To my knowledge."[3]

Further, according to plaintiff, Kraatz failed to include exculpatory information in the February 14, 2022 investigation report. For instance, plaintiff highlighted the following facts that, in his view, should have been included. First, R.G.'s mother told Kraatz via e-mail in January 2022 that, according to R.G., R.G. did not wear a uniform or participate in warm-ups before or during the Frankenmuth game. Second, both R.G. and her mother wrote undated letters, apparently directed to Kraatz himself, during or after the course of this investigation indicating that one reason for the requested transfer was the fact that R.G. had been the victim of an "altercation" that caused her to want to change schools to Heritage. According to plaintiff, the failure to include these exculpatory facts in the February 14, 2022 investigation report is evidence of a discriminatory intent.[4]

With regard to the merits of his ELCRA claim, plaintiff argued that he suffered an adverse employment action by defendants because defendants themselves were responsible for submitting the February 14, 2022 investigation report to the MHSAA; he was constructively discharged because he was essentially forced to quit; and defendants' articulated non-discriminatory reasons

---

[3] Plaintiff did not develop this assertion beyond briefly quoting the question-and-answer from R.G.'s deposition. For example, plaintiff did not identify the ratio of Caucasian to African-American players on the basketball team.

[4] Plaintiff observed in passing that "[i]nteresting to note here is that Mr. Seals was not the first African-American coach that Defendant Aimar initiated an MHSAA investigation ultimately resulting in suspension by the MHSAA." However, plaintiff did not factually develop this observation or even suggest that the previous incident was unjustified.

for their actions were both pretextual and not legitimate. Moreover, plaintiff conceded that his false-light claim should be dismissed but argued that the remaining claims should proceed to trial.

In November 2024, following a motion hearing, the trial court entered its 13-page written opinion and order granting summary disposition in favor of defendants. Concerning the ELCRA claim, the trial court agreed with plaintiff that "the two-year penalty imposed upon Seals by the MHSAA was an adverse employment action" because "[t]he parties have provided no case law that would suggest that the adverse employment action must be taken by the employer in order to be actionable." However, the trial court explained, the ELCRA claim failed since plaintiff did not show that defendants "submitted the information that they obtained through the [allegedly] false and incomplete investigation to the MHSAA to have him terminated *because of his race*." (Emphasis in original). The trial court reasoned that the letters written by R.G. and her mother about the alleged altercation apparently were written after the MHSAA investigation was complete and would not have aided plaintiff in any event because "there is absolutely nothing in these letters that would even suggest that any action taken by any of the defendants was racially motivated." The trial court added that plaintiff failed to sufficiently support his vague factual assertion that the STCS only interviewed Caucasian basketball players, and not African-American, basketball players, about the matter. Thus, the trial court concluded, plaintiff failed to prove that he was discriminated against because of his race.

Finally, concerning the tortious-interference claim, the trial court dismissed that claim as well because "Aimar did exactly what he should have when faced with inaccurate information on a student transfer form. Seals has proffered no evidence, documentary or otherwise, that Aimar acted to intentionally interfere with Seals's employment." Accordingly, the trial court granted summary disposition in favor of defendants pursuant to MCR 2.116(C)(10).

On appeal, plaintiff primarily challenges the trial court's dismissal of his ELCRA claim, but also briefly argues in a second appellate issue that the trial court erred by also dismissing his tortious-interference claim. With regard to his ELCRA claim, plaintiff asserts that he satisfied the burden-shifting framework commonly applied by federal and state courts when addressing discrimination claims that lack direct evidence of discrimination. Specifically, plaintiff states, "Plaintiff does not attack the sanction imposed by the MHSAA – Plaintiff attacks the investigation conducted by Kraatz, initiated by Aimar, to the extent that material information was withheld that would likely have changed the outcome." Further, with regard to his tortious-interference claim, plaintiff asserts that Aimar wrongfully "initiated the investigation by indicating to the MHSAA that he believed R-G and Plaintiff had a previous relationship . . . ." Defendants have responded, arguing that plaintiff failed to establish a question of fact with regard to either of these two claims.

## II. STANDARD OF REVIEW

"We review de novo motions for summary disposition brought under MCR 2.116(C)(10)." *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). "A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (emphasis omitted). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves

-8-

open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

## III. DISCUSSION

## A. ELCRA CLAIM

Plaintiff first argues that the trial court erred by dismissing his ELCRA claim against defendants. We disagree.

At the time relevant to this case, MCL 37.2202(1)(a) of ELCRA provided as follows:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.[5]

"The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016). "There are multiple ways to prove that a plaintiff was the victim of unlawful discrimination. Direct evidence of intentional discrimination is a sure but rare method of challenging an employer's decision." *Id*. at 607. "Direct evidence" is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 133; 666 NW2d 186 (2003) (quotation marks and citations omitted).[6]

In cases where there is no direct evidence of discrimination, a plaintiff must prove his or her case through circumstantial evidence. *Hecht*, 499 Mich at 607. The most common manner of proof in this regard is the familiar burden-shifting approach of *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). See *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). "The *McDonnell Douglas* approach allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Id*. (cleaned up).

---

[5] MCL 37.2202 was amended effective February 13, 2024, to include additional protected classes. See 2023 PA 6 and 31. However, those amendments are not relevant here, and we quote the statute in effect at the time the events in question occurred.

[6] While *Sniecinski* referred to "a motivating factor," the standard is but-for causation. See *Rouch World, LLC v Dep't of Civil Rights*, 510 Mich 398, 420; 987 NW2d 501 (2022) ("This Court has previously held that the operative phrase 'because of' in the ELCRA establishes a but-for causation standard. . . . In other words, causation is established where the discriminatory action would not have occurred but for the [protected class] of the complainant.").

The first step of the *McDonnell Douglas* approach is the prima-facie case itself, which requires a showing of four elements:

> (1) [the plaintiff] belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. [*Id*. at 463.]

"When the plaintiff has sufficiently established a prima facie case, a presumption of discrimination arises." *Id*. (quotation marks and citation omitted). "The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's termination to overcome and dispose of this presumption." *Lytle v Malady (On Rehearing)*, 458 Mich 153, 173; 579 NW2d 906 (1998) (quotation marks and citation omitted). "The articulation requirement means that the defendant has the burden of producing evidence that its employment actions were taken for a legitimate, nondiscriminatory reason. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Hazle*, 464 Mich at 464-465 (cleaned up). "If the employer makes such an articulation, the presumption created by the *McDonnell Douglas* prima facie case drops away." *Id*. at 465.

"At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id*. (quotation marks and citation omitted). "[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for unlawful discrimination." *Id*. at 465-466 (cleaned up). A plaintiff can establish that proffered reasons are pretexts by doing the following:

> (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision. [*Major v Village of Newberry*, 316 Mich App 527, 542; 892 NW2d 402 (2016) (quotation marks and citation omitted).]

Turning to the case before us, plaintiff has not submitted direct evidence of discrimination, such as a statement by a decision-maker that he or she acted against plaintiff because of his race. See *DeBrow v Century 21 Great Lakes, Inc*, 463 Mich 534, 539-540; 620 NW2d 836 (2001). Nor has plaintiff submitted circumstantial evidence of discrimination beyond the *McDonnell Douglas* framework, such as evidence that the workplace tolerated race-based language by its employees. See *Hecht*, 499 Mich at 610. Therefore, as the parties agree, plaintiff must proceed under the *McDonnell Douglas* framework alone.

As to the first step of the *McDonnell Douglas* framework, we agree with plaintiff that he established a prima facie case of discrimination. In particular, his race establishes that he was a member of a protected class, there is no dispute that plaintiff was qualified for the coaching position before the events at issue transpired, and his position was given to another individual of a different race. These facts satisfy the first, third, and fourth elements of the prima facie case. See *Hazle*, 464 Mich at 463.

Defendants, however, dispute whether plaintiff satisfied the second element of the prima facie case, i.e., that he "suffered an adverse employment action." *Id*. According to defendants, the coaching-ineligibility period and the class-requirement sanction imposed on plaintiff were the result of the MHSAA's actions, not defendants' actions. Defendants reason that they merely cooperated with a third-party investigation and cannot be liable for this cooperation. At this stage of the legal analysis, we disagree. While the parties have not provided us with relevant caselaw on the question, the Southern District of New York explained in somewhat analogous circumstances that "the initiation of either an internal investigation or a government investigation may constitute a materially adverse action only if it results in a hostile work environment, constructive discharge, or other employment consequences of a negative nature . . . ." *Robinson v De Niro*, 739 F Supp 3d 33, 97 (SD NY, 2023) (quotation marks and citations omitted). "[S]imply undergoing an investigation is not sufficient to constitute adverse employment action." *Id*. (quotation marks and citations omitted). "In the context of government investigations, there is . . . some suggestion in the law that the plaintiff must allege and prove that the report was made based on false information." *Id*. at 97-98. "Thus, for example, where an employer makes an incorrect report, a claim for retaliation will lie where the incorrect report results in charges which have a negative effect on the plaintiff's ability to continue her work or results in a criminal trial that is necessarily public and therefore carries a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Id*. at 98 (quotation marks and citations omitted). "Courts have also stated that an investigation may form the basis of an adverse employment action claim where the charges at issue resulted in subsequent employment consequences." *Id*. (cleaned up). "Further, being forced to defend against disciplinary charges may constitute an adverse employment action." *Id*. (cleaned up).

As applied here, plaintiff was forced to defend against, essentially, disciplinary charges sought by the MHSAA and, indirectly, the STCS. Moreover, these charges resulted in a coaching ineligibility period for plaintiff pending his completion of remedial compliance classes. Therefore, regardless of whether plaintiff was constructively discharged or voluntarily quit, the mere fact that he was forced to defend against some charges, and had some sanctions imposed against him as a result of those charges, satisfies the second element of the *McDonnell Douglas* prima facie case for the purposes of our discussion. See *id*.

Having concluded that plaintiff established the four elements of his prima facie case, the next question is whether defendants were able to "articulate a legitimate, nondiscriminatory reason for [their] employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle*, 464 Mich at 464. "The articulation requirement means that the defendant has the burden of producing evidence that its employment actions were taken for a legitimate, nondiscriminatory reason." *Id*. We agree with defendants that they articulated a legitimate, nondiscriminatory reason for their actions.

The record shows that R.G. sought to transfer to Heritage a few days after not being selected for the John Glenn High School varsity basketball team. When Aimar, the athletic director for John Glenn, reviewed her transfer form, it was within his prerogative to at least speculate whether these two events were related and bring the matter to the attention of the MHSAA and STCS. Moreover, Kraatz's investigation into the matter, which culminated in his February 14, 2022 investigation report, certainly reflects some legitimate concerns. For example, according to that report, plaintiff either lied to or misled Kraatz when he said that he had never coached R.G. in

his capacity as an AAU coach. The report also indicates that plaintiff allowed R.G. to be affiliated with the Heritage varsity basketball team in multiple respects despite purportedly being told a few months earlier that such affiliation was prohibited pending further developments. These facts implicate the "undue influence" section of the MHSAA Handbook, specifically the language in that section prohibiting cooperation between a prospective student-athlete and a coach at another school, as was plaintiff's role, to encourage a transfer. In other words, the facts outlined in the February 14, 2022 investigation report suggest the strong possibility that plaintiff cooperated with R.G. and her mother to have her transfer to Heritage to play varsity basketball, conduct which is prohibited by the MHSAA. Simply put, defendants have articulated a "legitimate, nondiscriminatory reason" for their actions. See *Lytle*, 458 Mich at 173 (quotation marks and citation omitted).

Therefore, the final question before us is whether plaintiff raised a triable issue that defendants' "proffered reason . . . was a pretext for unlawful discrimination." *Hazle*, 464 Mich at 466 (cleaned up). "The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury . . . ." *Id*. We conclude that plaintiff has failed to do so. According to plaintiff:

> How could Defendant's purpose be legitimate where they withhold relevant and exculpatory evidence from the investigation. MG told both Kraatz and Aimar that it was not her daughter in the video. This information was not provided to the MHSAA. Even if after the investigation, Kraatz did not provide the letters authored by MG and RG giving the reason RG transferred to Heritage High School. Even before the letters were written, RG and MG did provide information to Kraatz that the move was not athletically motivated, commenting only that it was a "lack of diversity." However, Kraatz, in his investigation, made the quality judgment to downplay this fact.
>
> * * *
>
> Here, the question of fact is simple: why did Aimar and Kraatz not provide the exculpatory information to the MHSAA once they had it. That is the conduct that is otherwise unexplained that creates a question of fact such that a jury is necessary.

We agree with plaintiff, as a general proposition, that an intentionally flawed investigation or a maliciously prepared investigation report to a third party that distorts the underlying facts would be strong evidence that the defendant-employer's articulated nondiscriminatory reason was, in reality, a pretext for unlawful discrimination. See *Major*, 316 Mich App at 542; *Robinson*, 739 F Supp 2d at 97. However, the facts of this case do not raise such concerns and, with regard to the three facts recited by plaintiff in the analysis section of his brief on appeal quoted above, we briefly note the following.

First, while the February 14, 2022 investigation report could have included the fact that R.G. allegedly told her mother that she did not wear a uniform or participate in warm-ups before or during the Frankenmuth game, that game was only mentioned in passing in the investigation report. It was not incumbent upon Kraatz to comb through his e-mail records to find and cite every

-12-

piece of potentially exculpatory evidence regarding minor details in his investigation report. Second, while plaintiff faults Kraatz for not providing the letters written by R.G. and her mother to the MHSAA, Kraatz explained in his deposition that they asked him to keep the contents of the letters "very confidential." Moreover, the letters would not have exonerated plaintiff from his problematic conduct outlined in the investigation report, such as concealing the intent to which he had interacted with R.G. in the past. Rather, the letters only would have provided a second reason for R.G.'s transfer to Heritage, beyond the alleged lack of diversity at John Glenn. Third, while plaintiff asserts that "Kraatz, in his investigation, made the quality judgment to downplay" lack of diversity as the reason for R.G.'s transfer, the record suggests otherwise. The investigation report, which was about three pages long, includes a full, substantial paragraph explaining that R.G.'s mother said that R.G. wanted to transfer to Heritage for greater diversity. The paragraph includes such details as references to a potential "diversity club" and R.G.'s possible interactions with a foreign exchange student. Thus, the investigation report did not "downplay" the alleged exculpatory reason why R.G. wanted to transfer to Heritage. Finally, we note that we have reviewed the other facts referenced by plaintiff in the trial court and on appeal, and we similarly find them to be either unsupported by the record or inconsequential in nature.

Ultimately, as noted, the inquiry in the final *McDonnell Douglas* step is whether plaintiff established a question of fact as to whether defendants engaged in unlawful discrimination. See *Hazle*, 464 Mich at 466. The record before us fails to establish such a question of fact. The investigation initiated and conducted by Aimar, Kraatz, and the STCS administration was reasonably within the bounds of what a person would expect in this matter. Plaintiff has not cited any act or omission by defendants in the course of this investigation that is so unexplained or unusual that it would suggest that unlawful discrimination is the true, underlying reason for the sanctions imposed against plaintiff. "The plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Town v Mich Bell Telephone Co*, 455 Mich 688, 704; 568 NW2d 64 (1997) (cleaned up). The facts of this case arguably do not show that defendants even engaged in conduct that was "wrong or mistaken," much less that their actions were motivated by an unlawful intent.

Accordingly, we affirm the trial court's dismissal of plaintiff's ELCRA claim under MCR 2.116(C)(10).

## B. TORTIOUS-INTERFERENCE CLAIM

Plaintiff next argues that the trial court erred by dismissing his claim against Aimar for tortious interference with a business relationship. We disagree.

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. [*BPS Clinical Laboratories v Blue Cross & Blue Shield of Mich (On Remand)*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996).]

"To fulfill the third element, intentional interference inducing or causing a breach of a business relationship, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification." *Dalley v Dykema Gossett*, 287 Mich App 296, 323; 788 NW2d 679 (2010). "To establish that a defendant's conduct lacked justification and showed malice, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Id*. at 324 (quotation marks and citation omitted). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id*. (quotation marks and citation omitted). "In order to succeed under a claim of tortious interference with a business relationship, the plaintiffs must allege that the interferer did something illegal, unethical or fraudulent." *Id*. (cleaned up).

In this case, as explained, Aimar's actions were justified by MHSAA regulations and its requirement that an investigation be undertaken. Plaintiff has not shown that Aimar acted with malice or otherwise engaged in illegal, unethical, or fraudulent conduct by initiating this investigation. See *id*. Therefore, the trial court correctly dismissed this claim under MCR 2.116(C)(10).

## IV. CONCLUSION

The trial court correctly dismissed plaintiff's ELCRA and tortious-interference claims under MCR 2.116(C)(10). Consequently, we affirm.

/s/ Michael J. Riordan
/s/ James Robert Redford
/s/ Sima G. Patel

-14-